UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT HORN and MARIAN HORN,    )
   )
     Plaintiffs,    )
   )
   v.    )    No.  4:08CV1033 TIA
   )
   )
ST. LOUIS COUNTY, et al.,    )
   )
     Defendants.    )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants Eric Austermann ("Austermann"), Joseph Brandt ("Brandt"), Kenneth Cox ("Cox"), Colin Foppe ("Foppe"), Sean Haefeli ("Haefeli"), Timothy Harrison ("Harrison"), Jeffery Hoots, Joshua Lawrence, Christopher Most, Jason Neuman, William Ostendorf, Charlie Rodriguez, and Robert Shelvy's Motion for Summary Judgment (Docket No. 167). Plaintiffs filed a Brief and Memorandum to All Motions for Summary Judgment (Docket No. 178). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Motion for Summary Judgment will be granted.

On November 5, 2012, Plaintiffs Robert Horn ("Robert") and Marian ("Marian") Horn filed a forty-nine page Fourth Amended Complaint adding Scott Cox as a Defendant[1] and Petition

---

[1]On February 14, 2013, Defendant Scott Cox was dismissed with prejudice.

alleging violation of constitutional rights (Counts I), violation of statutory civil rights (Count II)[2], conspiracy to violate civil rights (Count IV), assault and battery (Counts V and VI), intentional infliction of emotional distress (Counts VII and VIII), and false imprisonment (Counts XVI)[3] stemming from the events on September 9, 2005. Plaintiff Robert Horn alleges that Defendant police officers without probable cause pulled him out of his house, handcuffed him, and assaulted and arrested him. Plaintiff Robert Horn further alleges Defendants unlawfully arrested him without probable cause or a warrant and seized the firearms from his house. Next, he alleges false charges were entered in the Municipal Court of the County of St. Louis, Missouri against him for peace disturbance, resisting arrest, assault on a police officer, and interfering with a police officer. In the Second Cause of Action stemming from events on July 15, 2006, Plaintiff Robert Horn alleges violation of constitutional rights (Counts I), violation of statutory civil rights (Count II)[4], conspiracy to violate civil rights (Count IV), assault and battery (Counts V and VI), intentional infliction of emotional distress (Counts VII and VIII), and malicious abuse of process, false arrest, and false imprisonment (Counts XVI).[5] Plaintiff Robert Horn alleges Defendants Foppe, Most, Shelvy, Hoots, and Harrison entered his home without probable cause or a warrant and attacked him by tasering him four times and pepper spraying him once. Thereafter, Defendants handcuffed and assaulted him and seized his guns and firearms. Plaintiff Robert Horn further alleges that

---

[2]A review of the Fourth Amended Complaint shows no Count III set forth therein.

[3]A review of the Fourth Amended Complaint shows no Counts IX through XV set forth therein.

[4]A review of the Fourth Amended Complaint shows no Count III set forth therein.

[5]A review of the Fourth Amended Complaint shows no Counts IX through XV set forth therein.

Defendants falsely charged with peace disturbance and resisting arrest and had him incarcerated at the police station on the false charges.

In the Third Cause of Action stemming from the events on July 15, 2006, Plaintiff Marian Horn alleges that Defendants Foppe, Most, Shelvy, Hoots, and Harrison approached her in the yard requesting permission to enter the house. After she refused to give permission, Defendants Shelvy, Hoots, and Most handcuffed Plaintiff and placed her in a hot police car for over fifteen minutes. Only after agreeing to grant permission to enter the house, she was released from the vehicle. After videotaping the scene, one of the Defendants removed the camcorder and the video tape and memory card. Without probable cause, Defendants placed her under arrest for interfering with a police officer and thereafter she was found not guilty by a jury in the Municipal Court of St. Louis County on July 24, 2008. Plaintiff Marion Horn alleges violation of constitutional rights (Counts I), violation of statutory civil rights (Count II)[6], conspiracy to violate civil rights (Count IV), assault and battery (Counts V and VI), intentional infliction of emotional distress (Counts VII and VIII), and malicious abuse of process, false arrest, and false imprisonment (Counts XVI).[7]

In the Fourth Cause of Action, Plaintiff Robert Horn alleges a cause of action for slander and malicious prosecution against Defendants Haefeli and Cox. Plaintiff alleges that after he was arrested on September 9, 2005, Officer Haefeli placed a "hazard" designation on him for someone dangerous or mentally ill. In the Fifth Cause of Action, Plaintiff Robert Horn alleges causes of action for slander and malicious prosecution contending that on September 9, 2005, Defendant

---

[6]A review of the Fourth Amended Complaint shows no Count III set forth therein.

[7]A review of the Fourth Amended Complaint shows no Counts IX through XV set forth therein.

Scott Cox, brother of Defendant Ken Cox, called St. Louis County dispatch 911 and falsely reported seeing him shoot a firearm. This false report resulted in Robert Horn being attacked, his home invaded, and his guns seized. On February 14, 2013, Defendant Scott Cox was dismissed with prejudice.

The Defendants are William Ostendorf, Robert Shelvy, Joshua Lawrence, Joseph Brandt, Jason Neuman, Sean Haefeli, Colin Foppe, Christopher Most, Jeffery Hoots, Timothy Harrison, Charlie Rodriguez, Eric Austermann, and Kenneth Cox, sued in both their individual and official capacities.

Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The burden of proof is on the moving party to set forth the basis of the motion, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. Id. "[T]he nonmovant must respond by submitting evidentiary materials that 'set out specific facts showing a genuine issue for trial.'" Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(e)(2)). The non-moving party may not rest upon her pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. Id., at 324. The nonmovant must "explain the legal significance of her factual allegations beyond the mere conclusory statements importing the appropriate terms of art." Quinn v. St. Louis Cnty., 653 F.3d

745, 752 (8th Cir. 2011).

In passing on a motion for summary judgment, the Court must review the facts in a light most favorable to the party opposing the motion, and give that party the benefit of any inference that logically can be drawn from those facts. Buller v.Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). At the summary judgment stage, the undersigned will not weigh the evidence and decide the truth of the matter, but rather the undersigned need only determine if there is a genuine issue of material fact for trial. Anderson, 477 U.S. at 249. Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted); Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 at 248. Further, if the nonmoving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, ... there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23.

Nonetheless, it is clear to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Sys., Inc., 348 F.3d

732, 733-34 (8th Cir. 2003). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 526-27 (8th Cir. 2007). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." Kountze ex rel. v. Hitchcock Foundation v. Gaines, 2008 WL 2609197, at * 3 (8th Cir. 2008). "'Only disputes over the facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" Bass v. SBC Commc'ns, Inc., 418 F.3d 870, 872-73 (8th Cir. 2005) (quoting Anderson, 477 U.S. at 248). Thus, Plaintiffs, even though the non-moving party for summary-judgment purposes, "must still 'present[] evidence sufficiently supporting the disputed material facts [such] that a reasonable jury could return a verdict in [its] favor.'" Pope v. ESA Servs,, Inc., 406 F.3d 1001-1003-04 (8th Cir. 2005) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48.

An affidavit used to contest a motion for summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4). The court should disregard those portions of an affidavit that fail to comply with the requirements of Rule 56(c)(4). Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 801 (8th Cir. 2004); Fed.R.Civ.P. 56(e). Nor should the court consider those portions of an affidavit that conflict with the affiant's prior deposition testimony, unless the conflict is a product of prior confusion. City of St. Joseph v. Sw. Bell Tel., 439 F.3d 468, 476 (8th Cir. 2006). The court must exercise extreme care when

evaluating whether a potential conflict exists and whether the conflict requires exclusion of the conflicting affidavit.  Id.

**The Undisputed Evidence before the Court on the Motion**

**1. Background and Underlying State Criminal Cases**

Plaintiffs Robert and Marian Horn filed this instant action pursuant to 42 U.S.C. § 1983 alleging violations of their civil rights during the course of events on September 9, 2005 and July 15, 2006.  Plaintiffs filed this instant action before their underlying criminal cases were tried in state court.  See St. Louis County v. Robert D. Horn, Nos. I09103741 and I09103751 (Deft.'s Exhs. D-F).  At the request of the parties, the undersigned entered an Order staying the proceedings in this case pending final resolution of the criminal cases then pending against Plaintiffs.  In the Information in Cause No. 09103741 stemming from the events of September 9, 2005, Plaintiff Robert Horn was charged with two counts of assault by kicking a sliding screen door onto Defendants Haefeli and Brandt and a count of interference with an officer by refusing the command of Haefeli to place his hands behind his back.  (Exh. D, No. 09103741).  In the Information in Cause No. 09103751 stemming from the events of July 15, 2006, Plaintiff Robert Horn was with one count of peace disturbance by threats; one count of public disturbance of the peace: loud noise; one count of assault by yelling at the victim causing her fear of immediate physical injury; one count of interference with a police officer by refusing the commands of Defendant Foppe to show his hands and resisting arrest; and one count of assault by repeatedly kicking Defendant Hoots in his legs.  (Exh. L).

Prior to closing argument and at the close of all the evidence, St. Louis County nolle prosequis the September 9, 2005 assault count and the July 15, 2006 peace disturbance count.

(Exh. E).  On April 11, 2012, the jury returned guilty verdicts on the two counts of interference of a police officer; one count of the noise disturbance; and the July 15, 2006 assault.  (Defts' Exhs. E, F, and N; Pltfs' Exh. 1).  The jury returned not guilty verdicts to the two counts of assault stemming from the events of September 9, 2005 and July 15, 2006.  (Defts' Exhs. E and N; Pltfs' Exh. 1).  On June 29, 2012, the Circuit Court of St. Louis County Municipal Court sentenced Robert Horn to a two-year suspended imposition of sentence.  (Exh. G).  The firearms that were seized by Haefeli were forfeited pursuant to the court order following Robert's guilty verdict, and the court imposed a prohibition on possessing any weapons.  (Id.).  On June 24, 2008, the court entered a not guilty verdict as to Marian based on the jury verdict.  (Pltfs' Exh. 3).  During the criminal proceedings, Robert Reinhold represented Robert Horn and filed motions to dismiss the case and to suppress evidence prior to the trial.  (Exhs. H and I).

After the resolution of the state criminal actions, Defendants filed a summary judgment motion addressing Plaintiffs' claims.  Because it appeared that all criminal proceedings had been completed, the undersigned lifted the stay previously imposed.  The Court has carefully reviewed the record before it and takes judicial notice of the underlying criminal cases.

### 2.  September 9, 2005

On September 9, 2005, St. Louis County police officers Brandt, Haefeli, Neuman, Lawrence, Shelvy, and Ostendorf at around 3:00 a.m. responded to 4866 Viento Drive to investigate a call of shots being fired.  (Brandt Aff. at ¶¶ 6-7; Haefeli Aff. at ¶¶ 6-8; Lawrence ¶¶ 6-8; Neuman at ¶¶ 5-7; Ostendorf at ¶¶ 5, 8; Shelvy Depo. at 7; Exh. A).  Shelvy responded by himself as a watch supervisor to the scene in response to a  radio call at the house, and other officers arrived before him.  (Shelvy at 7-8).  Ostendorf explained how a shots being fired call

involves a possibility of injury to police officers or other persons by a firearm. (Ostendorf Aff. at ¶ 9). Because he had problems locating the address due to the lack of street lights, and the house not being illuminated, Ostendorf arrived after several other St. Louis County police cars. (Id. at ¶¶ 10-11). Upon arrival, Ostendorf talked to Shelvy, and they decided to make contact with anyone inside the house and Ostendorf and Lawrence approached the front door. (Id. at ¶¶ 12-14; Lawrence at ¶¶ 10-11; Neuman at ¶ 9; Haefeli at ¶12). After knocking and announcing their presence, no one answered the front door. (Ostendorf at ¶ at 15; Lawrence at ¶¶ 11-12).

When they were unable to make contact with anyone inside the house, the police officers went to the back of the house. (Ostendorf at ¶ 16). By the time Ostendorf arrived at the back of the house, Robert Horn was already handcuffed on the wooden deck and acting belligerently by yelling and screaming at the officers causing him to believe Robert was under the influence of alcohol and drugs. (Ostendorf at ¶¶ 18-20). Ostendorf observed an older man and Robert Horn's sister either on the deck or in the family room off the deck, and Marion Horn was asking why they were there. (Ostendorf at ¶ 22).

Lawrence and Neuman went around to the back of the house but they did not recall if Robert was already handcuffed when they arrived. (Lawrence at ¶¶ 13-14; Neuman at ¶¶ 10-11).

Brandt and Haefeli went the backyard to see if any persons were inside the house and observed a patio with a partially open sliding glass door and an older man lying on a coach inside the residence. (Brandt Aff. at ¶¶ 10-12; Haefeli at ¶¶ 11, 13-14). While standing outside the sliding glass door, Haefeli and Brandt identified themselves as police officers, and the older man on the couch appeared to wake up and get off the couch. (Brandt at ¶¶ 13-14; Haefeli at ¶¶15-16). Haefeli and Brandt observed another man quickly come out of the hallway holding a small black

- 9 -

dog in his arms. (Haefeli at ¶ 17; Brandt at ¶ 15). The man, later identified to be Plaintiff Robert Horn, stood inside the house and started screaming at the officers saying "what the fuck do you guys want," and "get the fuck out of here." (Haefeli at ¶ 18; Brandt at ¶ 17). After Brandt and Haefeli identified themselves as police officers, they directed Robert to come outside on the patio, but Robert continued to stand inside the house and continued to yell and curse. (Brandt at ¶ 19; Haefeli at ¶ 20). After they directed Robert to calm down and come outside to talk, he continued to yell at them. (Haefeli at ¶¶ 21-22; Brandt at ¶¶ 20-21).

As Robert stepped outside onto the patio, he continued to curse loudly and yelled "you guys are fucking assholes," and then he kicked the sliding screen door off its track and hitting the officers. (Haefeli at ¶¶ 22-23; Brandt at ¶¶ 22-24). Robert failed to cooperate with their requests to calm down, and he appeared to be intoxicated. (Haefeli at ¶ 24, 34; Brandt at ¶ 25). Haefeli informed Robert that he was under arrest for peace disturbance and assault third degree because of his kicking the screen door at the officers. (Haefeli at ¶ 25; Brandt at ¶ 26). Robert refused Haefeli's requests to place his hands behind his back and to put his dog down so he could be handcuffed. (Haefeli at ¶ 26; Brandt at ¶¶ 26, 28). His sister Marian Horn came outside. (Brandt at ¶ 27). Haefeli then grabbed the dog out of Robert's arms and placed him under arrest and handcuffed him. (Haefeli at ¶ 27; Brandt at ¶ 29; Shelvy at 9). Haefeli then told Robert that he was also being charged with interfering with the duties of a police officer due to his uncooperative behavior. (Haefeli at ¶ 28; Brandt at ¶ 30). Haefeli and Brandt advised Robert that they were at his residence to investigate a report of shots being fired, and he denied having any guns. (Haefeli at ¶ 29; Brandt at ¶¶ 31-32). Robert appeared to be under the influence of alcohol. (Haefeli at ¶ 34; Brandt at ¶ 25; Ostendorf at ¶ 20). While Brandt secured the perimeter of the house by staying

on the patio, Haefeli and other officers entered the house to conduct a protective sweep of the residence because the call was for shots fired. (Haefeli at ¶ 30; Brandt at ¶ 33, 38). Haefeli entered Robert's bedroom and saw several semi-automatic rifles and rounds of ammunition out in plain view. (Haefeli at ¶ 31; Brandt at ¶ 34). Marion followed the officers inside the house and when asked if Robert had been shooting any guns, she indicated that she did not know because she was sleeping. (Haefeli at ¶¶ 35-36). Haefeli seized five firearms, four magazine clips, and several .22 caliber and .12 gauge rounds of ammunition.[8] (Haefeli at ¶ 37, Exh. A). Haefeli informed Robert of his Miranda rights, and Robert indicated that he understood. (Haefeli at ¶ 32; Brandt at ¶ 35). When Haefeli asked Robert if he had been shooting any guns, he responded, "that's your job to find out." (Haefeli at ¶ 33; Brandt at ¶ 36).

In his affidavit, Robert Horn averred how he went to his room around 11:00 in the evening of September 8, 2005 and, he was awakened in the early morning on September 9, 2005 by the barking of his dog, Lucy. ®. Horn at ¶ 4). Robert further avers that when he entered the family room, he saw someone pointing a gun at his father and yelling at him to "get up" and "come outside." (Id.). Robert questioned the persons he saw on the deck outside the family room and asked "who are you, and what the fuck are you doing here?" and "get out of here." (Id. at ¶ 5). As he exited the house, he recognized the persons to be police officers and moved toward the screen door while Haefeli was unsuccessfully attempting to open the closed screen door. (Id. at ¶ 6). Robert averred as he tried to come out the screen door, Haefeli grabbed his right arm and pulled him through the door thereby causing the screen door to come off its track and fall onto

---

[8]The five firearms seized were three semi-automatic rifles, one revolver, and one pistol, and all of the firearms were forfeited. (Exhs. A and F).

Brandt who said "now I got you for assault." (Id. at ¶ 8). Horn watched as a couple of officers rushed into the house through the open sliding door while other officers remained outside with Robert and his father. (Id. at ¶ 9). Robert further averred that no one gave permission to enter the house. Robert explained how Haefeli pushed him into a large dog kennel and directed him to put down Lucy. (Id. at ¶ 10). When Marian entered the family room, an officer gave Lucy to her, and Robert was handcuffed and placed under arrest, but he was never apprised of his charges or how the officers were investigating shots being fired. (Id. at ¶¶ 11-12).

In his affidavit, Robert further averred that he consumed some beers on September 8, 2005, and he believed he had no residual effects from the alcohol consumption by early morning September 9, 2005. (Id. at ¶ 14). He contends that he was not unruly or uncooperative except when he did not comply with the directive to put Lucy down, because she would run away from the unfenced yard. (Id. at ¶¶ 10, 14).

In her affidavit, Marian Horn averred she was asleep at her home when she was awakened by a commotion in the family room and on the back deck. (M. Horn at ¶ 4).

After being transported to St. Louis County Jail, Robert was booked. (Haefeli at ¶ 38). Haefeli packaged the seized firearms and logged them into the system. (Id. at ¶ 39). In the History and Physical Report, a nurse completed a routine general medical examination and noted observing Robert for possible ethanol withdrawal. (Exh. B). Robert admitted to having consumed six beers at his house that night. (Horn Interrogatory Answers, Exh. C). He did not complain of any beating during this incident and did not seek any medical treatment after the incident. (R.Horn Depo. at 118-19).

Haefeli wrote St. Louis County Police investigative report 5-79780 regarding the

September 9, 2005 incident.  (Haefeli at 46; Exh. A).  Based on the discovery of the firearms in the house, the nature of the call, and his observations of Robert's mental state, Haefeli had a safety alert, a Computer Aided Dispatching ("CAD") alert, placed on the address following the September 9, 2005 incident.  (Id. at ¶ 42; Cox Depo. at 8, 11).  A CAD alert is used for law enforcement purpose and allows a police officer to enter a computer alert on an address so in the future police officers are aware of any safety issues or possible hazards when police officers are called to respond to that address.  (Haefeli at ¶¶ 44-45).

Police officers Austermann, Hoots and Captain Cox were not at 4866 Viento Drive on September 9, 2005.  (Cox Depo. at 20; Austermann at ¶ 18; Hoots at ¶ 68).  During her deposition, Marian testified that she did not recall any specific conduct by Lawrence, Brandt, Neuman, Haefeli, or Cox.  (Marian at 67-68).

### 3. July 15, 2006

Around 10:30, Mary Ellen Cox called the police to report that her neighbor, Robert Horn, was cussing at and threatening her and screaming profanities and obscenities.  (M.Cox Depo. at 11-13).  As she exited her car, Robert yelled, "you motherfucker, I am going to kill you; come on out here."  (Id. at 13-14).  His words frightened her, and Mary Ellen Cox entered her house and woke up her husband. (Id. at 14, 17).  Mary Ellen Cox called 911 and identified herself and reported how her neighbor was screaming and yelling at her, and she felt very threatened by the tone of his voice and his screaming and yelling.  (Id. at 18-19).  After placing the 911 call, she called her son, Captain Kenneth Cox ("Captain Cox"), at home and told him how Robert was outside yelling.  (Id. at 23-24).

Captain Cox called 911 to report what his mother was telling him about Robert's behavior and threats, and how she thought she heard shots being fired again.  (Cox Depo. at 15-16).  Captain Cox could hear screaming in the background while on the phone with his mother.  (Id. at 19).  Based on the September 9, 2005 incident when Robert was arrested after an assault weapon was fired, Captain Cox made a statement suggesting Robert was deranged.  (Id. at 19-20).  Captain Cox then called Hoots, the watch supervisor at the South County precinct, and apprised him of Robert screaming incoherently and making threats at his parents' house.  (Id. at 18).  Captain Cox advised Hoots to be careful.  (Id. at 21).  Captain Cox was not on duty  at that time, and he never left his house and did not go to 4866 Viento Drive.  (Id. at 7-8).

While on duty at the South County Precinct Station on July 15, 2006 around 10:30 p.m., Hoots received a phone call from Cox concerning his mother calling him to report that her neighbor, Robert, was yelling and threatening her.  (Hoots at ¶¶ 6-7).  Cox shared how there had been a prior arrest of Robert at his home address, and how firearms had been involved in the prior incident and warned responding officers should be careful.  (Hoots at ¶¶ 8-9).  Cox also reported how his mother had heard shots fired.  (Hoots at ¶ 10).  Hoots heard a radio dispatch noting how police officers were responding to a call for peace disturbance at 4866 Viento Drive, and the dispatcher noted how the caller reported her neighbor was yelling and cursing at the caller.  (Hoots at ¶¶ 12-13).  The dispatcher also reported how there was an alert on 4866 Viento Drive stemming from a prior incident at that address involving the police and Robert.  (Hoots at ¶ 14).

A police radio call for peace disturbance was dispatched, and Hoots, Most, Foppe, Shelvy, Rodriguez, and Harrison responded to 4844 Viento Drive.  (Shelvy at 11; Most Depo. at 10;

Foppe at 12; Rodriguez Depo. at 6). The dispatcher indicated that there was an alert on the address and a report of shots fired. (Foppe at 12, 16-18).

When he responded, Hoots had problems finding the street because the street was very dark and the house was not illuminated. (Hoots at ¶ 15). Other police officers were already at 4866 Viento Drive when Hoots arrived, and Marion met them in the driveway and asked why they were there. (Hoots at ¶¶ at 16, 18). Hoots and Foppe explained that they were responding to a call for peace disturbance and a report of shots being fired and wanted to check on the welfare of her brother and anyone else in the house based on the information they had. (Hoots at ¶¶ 19-20; Foppe at 16-17). During her deposition, Marian testified that Rodriguez grabbed her arms and hands, and Most handcuffed her on her wrists and walked her to the police cruiser, and he very carefully helped her into the cruiser. (Marion Horn Depo. at 55-56). During the trial, Marian testified that the officers asked a few times to enter the house, but she refused saying "No, I don't want you in my house," and reported that her brother was probably drunk. (Trial tr. at 226). Marian testified that she spent fifteen to seventeen minutes inside the hot cruiser and felt flush, and Shelvy asked to enter the house, and when she declined the request, Shelvy slammed the door closed. (Marian Depo. at 72, 77, 83). Shelvy removed Marian from the police car at the point that she gave permission to enter the house. (Shelvy at 12). Foppe asked Marian to cooperate and have her brother step outside to talk to them. (Foppe at 17). Hoots had Marian to move away from the house toward the street with another officer. (Hoots at ¶ 22). After Shelvy arrived, he talked with Marian on the driveway, and she gave permission for the police officers to enter the house. (Hoots at ¶¶ 23, 25; Foppe at18-19; Shelvy at 12-13; Most at 15). Hoots requested a

helicopter to come to the address to provide light around the house using its night sun spotlight. (Hoots at ¶ 24).

Marian went with Foppe, Hoots, Most, and Shelvy to get her dog out of the house, and she noted her father was in the living room sleeping. (Hoots at ¶¶ 26-27; Foppe at 19; Most at 15). Marion secured her dog. (Hoots at ¶ 28). A contact team was formed with Hoots assigned the less-lethal officer armed with a Taser, Most assigned the hands-on officer, Foppe assigned the lethal officer armed with an AR rifle, and Shelvy assigned the team leader and observer. (Hoots at ¶ 30; Foppe at 19-20; Shelvy at 14). After the contact team entered the house through the back door, they saw Robert E. Horn asleep on the couch in the living room. (Hoots at ¶¶ 31-32; Foppe at 19; Most at 16). Hoots saw a hallway with two or three closed doors, and he heard movement inside one of the rooms. (Hoots at ¶¶ 33-34; Most at 18). Foppe gave verbal commands to Robert to come out with his hands up and then repeated the verbal commands. (Hoots at ¶¶ 35-36; Shelvy at 15; Foppe at 24-25). One of the doors opened and Robert walked out smoking a cigarette in his right hand and his left hand behind his back. (Hoots at ¶¶ 37-39; Shelvy at 15-16; Foppe at 25-26; Most at 19-20). Hoots, Foppe, and Most could not see what was in his left hand because he had his left hand behind his back. (Foppe at 26; Most at 19-20, 28; Hoots at ¶ 39). Foppe was concerned for their safety, and he ordered Horn multiple times to remove his hand from behind his back and show his left hand. (Foppe at 26-27). In response to Foppe's order to show his hand, Robert started to laugh, flicked his cigarette at the officers and told the officers to get out of the house. (Hoots at ¶¶ 40-41; Foppe at 26; Shelvy at 16). Foppe twice ordered Robert to show his hands and to get on the floor, but he failed to comply. (Hoots at ¶¶ 42-43; Foppe at 27; Most at 22). Without showing his left hand, Robert started to move toward the contact team in an

aggressive manner and did not stop when ordered to do so.  (Hoots at ¶ 44; Shelvy at 16).  Hoots

shot him in the chest with his department issued Taser when he failed to comply with Foppe's

command and failed to stop.  (Hoots at ¶ 45; Shelvy at 16; Most at 23, 28; Foppe at 27).  Robert

appeared to be temporarily stunned and then he pulled the two darts/probes out of his body and

stated, "get the fuck out of my house."  (Hoots at ¶ 46; Shelvy at 16-17; Most at 23, 28).  After

Robert started to move towards the officers a second time, Foppe then shot Robert in the stomach

with his department issued Taser, and he fell to the floor and turned away from the contact team.

(Hoots at ¶¶ 47-48; Shelvy at 17-18).  Most held Robert on the floor, and Robert started to kick

and tried to get up off the floor.  (Hoots at ¶ 49; Shelvy at 18).  After he kicked Hoots in the right

leg causing him to fall, Hoots used his Taser to drive stun[9] Robert's leg.  (Hoots at ¶¶ 50-51;

Shelvy at 21; Foppe at 27).  Robert refused to remove his hands from underneath his stomach so

that he could be handcuffed by Most, and he pulled away from Most and tried to grab him. (Hoots

at ¶¶ 52-53; Shelvy at 18, 20; Most at 32).  Shelvy told Robert to calm down and stop fighting the

officers.  (Shelvy at 21).  After Foppe used his Taser to drive stunned Robert in his shoulder,

Foppe, Most, and Hoots were able to grab his arms, and Most handcuffed him.  (Hoots at ¶¶ 54-

56; Shelvy at 21-23; Most at 34; Foppe at 27).

As Foppe, Most, and Hoots tried to move Robert from the hallway area to outside of the

house, he kicked Hoots again and tried to pull away, and they lost their balance as Robert

struggled with them.  (Hoots at ¶¶ 57-58).  They all fell in the kitchen, and Robert continued to

kick at Hoots, Most, and Foppe.  (Hoots at ¶¶ 58-59; Foppe at 27).  Hoots retrieved his pepper

---

[9]Drive stunned is tasing without discharging the probes. You place the taser directly
against someone and activate the taser.  (Shelvy at 21-22).

spray and administered two one-second bursts of pepper spray to his face, and Robert rolled onto his stomach. (Hoots at ¶¶ 60-61; Shelvy at 23). Most then secured flex cuffs on Robert's legs to prevent him from kicking. (Hoots at ¶ 62; Shelvy at 53; Most at 36). Robert continued to kick and scream and curse at the officers. (Shelvy at 23-24). Marian shoved aside Rodriguez with her body, screaming to get to her brother. (Shelvy at 23-25; Rodriguez at 12, 16). Several of the officers directed Marian to get back, and Shelvy told her to leave the room or move away, or she would be arrested. (Shelvy at 24; Rodriguez at 16-17). Marian refused, and Rodriguez placed her under arrest at the direction of Shelvy and charged her with interference, and he took her outside. (Shelvy at 24, 27; Rodriguez at 16-17, 21). During her deposition, Marian testified that Shelvy threw the camcorder on the floor, and another officer tried to remove the tape out of the camcorder. (Marian at 106). She further testified that another police officer destroyed her camcorder by trying to force it open, but she did not know the officer. (Marion at 125). Shelvy averred that he did not see Marian using a camcorder while in the kitchen of the house, and he did not order Harrison to take the camcorder from Marian. (Shelvy Aff. at ¶¶ 7-8). Shelvy testified that he picked up the camera from the kitchen floor and placed it on the counter. (Shelvy at 25). After placing Marian under arrest, Rodriguez took her out to the car, and Most transported her to intake at St. Louis County and was charged with interfering with a police officer. (Shelvy at 27; Most at 40-41). In support of the charge, Shelvy noted how Marian refused to leave after being repeatedly asked to leave, and she shoved a police officer out of her way while he was guarding her brother who was under arrest. (Shelvy at 27). During a protective sweep of the house, Foppe found two firearms and seized the firearms for safekeeping, and Robert was arrested. (Hoots at ¶¶ 63-64; Foppe at 27, 47).

While on patrol on July 15, 2006 around 10:30 p.m., Harrison received a radio call for a peace disturbance at 4866 Viento Drive. (Harrison Aff. at ¶¶ 5-6). When he arrived, there were other police officers already at the scene. (Id. at ¶ 9). Harrison set up a perimeter by standing at a tree located at the right front corner of the house. (Id. at ¶¶ 10-11). By establishing a perimeter around the house, no one could enter the yard while other police officers tried to make contact with persons inside the house. (Id. at ¶ 12). Harrison remained in this position for approximately ten minutes while other police officers were inside the house. (Id. at ¶ 13). After hearing that a suspect was in custody by officers inside the house over his department radio, Harrison returned to his car and left 4866 Viento Drive to return to his patrol duties. (Id. at ¶¶ 14-15).

In his affidavit, Robert Horn averred that on the evening of July 15, 2006 he was in his parked vehicle in the driveway listening to music when a vehicle with high beams pulled into his neighbor's driveway. (®. Horn Aff. at 15). He explained how he yelled loudly so his neighbor could hear him and requested the person turn off the car lights. (Id. at ¶ 16). Robert acknowledged that he might have made the request twice. (Id.). When he returned to his vehicle, Robert realized Lucy had escaped though the open car door so he walked in the direction of the field where he say her running and yelled for several minutes for his dog to come to him. (Id. at ¶ 17). Robert averred that he never cursed or threatened anyone in the Cox household including Mary Ellen Cox. (Id. at ¶ 18).

Robert averred that he returned to the house and went to his bedroom and closed the door and watched television. (Id. at ¶¶ 20-21). Later, when he left his bedroom to go to the bathroom, Robert observed lights at the end of the hallway. (Id. at ¶ 22). He opened the hallway door to investigate the source of the lights, and he saw one police officer with a rifle pointed at him and

two other police officers standing behind him.  (Id. ).  Robert averred that the police officers did not say anything to him, and he made a nervous laugh, and then the officers tased him two seconds later.  (Id. at ¶ 23).  Two barbs hit him in the stomach area, and when he swept away the barbs, the cigarette went flying out of his hand.  (Id.).  Robert further averred that within seconds the officers discharged another taser hitting him in the chest and paralyzing him and causing him to fall face down with his arms clutching his chest and temporarily lose consciousness.  (Id. at ¶¶ 24, 26).  Next, the officers kicked and punched Robert in the head and his body and then he was dry stunned in the shoulder.  (Id. at ¶ 25).  After regaining consciousness, he was dragged into the kitchen and placed on the floor face down.  (Id. at ¶¶ 26-27).

After Marian entered the kitchen, Robert averred that she picked up her video camera and started filming.  (Id. at ¶ 29).  Shelvy ordered Harrison to get the camera and remove the tape but Harrison could not remove the tape.  Shelvy took the camera from Harrison, but he could not remove the tape so he threw the camera on the floor.  (Id. at 29).  Robert averred that Shelvy ordered the officers to get Marian out of the kitchen and Shelvy ordered an officer to mace him.  (Id. at ¶¶ 30, 33).  An officer administered a long burst of mace into his eyes and face.  (Id. at ¶ 34).

In her affidavit, Marion Horn averred how after she noticed bright lights on the driveway from the kitchen, she went outside and walked down the bottom of the steps and saw Most, Rodriguez, and Hoots, and Most and Rodriguez reported being there investigating a peace disturbance.  (M. Horn Aff. at ¶¶ 12-13).  When asked if they could enter the house, Marian said no and then Rodriguez handcuffed her, and an unidentified officer placed her in the back seat of the hot patrol car.  (Id. at ¶¶ 13-14).  After being in the car for fifteen minutes, Shelvy opened the

door and asked permission to enter the house. (Id. at ¶¶ 15-16). Within a few minutes, Marian panicked and yelled to be let out because she might pass out, Shelvy again requested to enter the house, and Marian agreed to let one officer enter the house. (Id. at ¶¶ 17-18). Shelvy immediately released Marian from the car. (Id. at ¶ 18).

After securing her dog in the kennel, Marian observed Rodriguez outside on the deck and entered the kitchen and observed Robert on the floor with his hands in handcuffs behind his back. (Id. at ¶¶ 21-24). When Marian heard Most as if they should tase Robert again, she grabbed her camcorder and started recording Robert and the officers. (Id. at ¶ 25). When she refused to turn off the camcorder, Shelvy ordered Harrison to take the camera and get the tape out. (Id. at ¶¶ 27-28). When Harrison could not pry open the camcorder, Shelvy took the camcorder and threw it on the floor. (Id. at ¶ 28). After Shelvy ordered an officer to remove Marian, she went outside and sat down. (Id. at ¶¶ 29-31). Shelvy ordered Most and Rodriguez to arrest Marian without stating why. (Id. at ¶ 34). After she returned home from holding, Marian found her broken camcorder with the tape and memory card missing. (Id. at ¶ 35).

Approximately around 2:00 a.m. on July 16, Austermann received a call to respond to St. Anthony's Hospital to pick up Robert after the completion of a fit for confinement medical examination at St. Anthony's Hospital following his arrest. (Austermann Aff. at ¶¶ 7-8; Foppe at 35; Rodriguez at 21). The reason for evaluation stemmed from Robert being hit with tasers/mace, and the examining doctor found he had superficial wounds and normal other findings, and the doctor gave him a tetanus shot. (Exh. S). In the History and Physical Report, a nurse completed a routine general medical examination. (Exh. P). In the History and Physical Report, a nurse completed a routine general medical examination and noted Marian refused to answer any

questions. (Exh. Q). Austermann placed him in the car and left St. Anthony's at 2:34 a.m. and arrived at intake at St. Louis County Jail at 2:55 a.m. (Austermann at ¶¶ 11-12). Beyond the fit for confinement medical examination at St. Anthony's Hospital, Robert did not receive medical treatment for the injuries he alleges he sustained on July 15, 2006. (Horn Depo. at 189-90, 194, 202).

Captain Cox did not order any police officers to make any arrests or suggest what should be done during the July 15, 2006 investigation. (Cox at 21). The decision to make arrests on July 15, 2006 was made by the on-duty officers. (Id.). During her deposition, Marian Horn testified that she was pretty sure Cox instructed the officers to take action. (Marian at 155).

Police officers Ostendorf, Brandt, Lawrence, Haefeli, Cox, Austermann, and Neuman were not at 4866 Viento Drive on July 15, 2006. (Cox Depo. at 7-8; Austermann at ¶¶ 15-16; Haefeli at ¶ 51; Ostendorf at ¶ 30; Brandt at ¶ 40; Lawrence at ¶ 18; and Neuman ¶ at 17). Robert Horn admitted that Cox was not at his house on either of the dates. (Id. at 117, 162-63). During her deposition, Marian testified that she did not see Cox at her house on September 9, 2006, and she could not identify any conduct taken by Ostendorf, Lawrence, Brandt, Neuman, Haefeli on July 15, 2006. (Marian at 144, 150).

During his deposition, Robert Horn was unable to identify by name the officers or provide the names of the officers who committed any specific acts and indicated that he would clarify their names at trial. (Horn Depo. at 88, 162). Robert acknowledged he had consumed a few beers, maybe four to five beers. (Id. at 119). Robert admitted he had been pushed and maybe had a bruise as a result of the incident. (Id. at 118). Robert also acknowledged he did not make any

complaints at the jail about the incident or alleged any physical injury from the handcuffs.  (Id. at 119).

During her deposition, Marian Horn testified how Most was pretty gentle when he handcuffed her, and he very carefully helped her into the police cruiser.  (Marian Depo. at 56).  She further testified that her physical injury included markings on her wrists from the handcuffing for almost a day and slight bruising.  (Id. at 160).  She testified that after she was detained in a hot police car for approximately fifteen minutes, she experienced a hot flash sensation, but she felt better once she poured water over herself so she did not request an ambulance or seek any medical attention at the St. Louis County Jail.  (Id. at 64, 72, 83, 106-07, 118-19).  Marian did not seek any medical treatment immediately following her arrest on July 15, 2006.  (Id. at 161).  Marian testified she receives treatment all the time for heat stress.  (Id. at 163).  On June 29, 2009, Dr. Mary Kreuter treated her for hot flashes occurring about four times a day-short duration.  (Exh. R; Marian Depo. at 164).  After treatment, the doctor noted how Marian would call as needed.  (Exh. R).  Marian testified that she had not seen Dr. Kreuter for heat stress prior to July 28, 2009. (Marian Depo. at 165).

## II.     Motion for Summary Judgment

In order to obtain relief, Plaintiffs must demonstrate that the Defendants had personal involvement in the alleged constitutional violations.  Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001); Martin v. Sargent, 780 F.3d 1334, 1338 (8th Cir. 1985) (§ 1983 plaintiff must allege that defendant was personally involved in or had direct responsibility for incidents that resulted in injury).  As noted by Defendants' counsel, the instant record is devoid of any evidence against Defendants Ostendorf, Lawrence, Neuman, and Austermann.  "Liability under § 1983 requires a

casual link to, and direct responsibility for, the alleged deprivation of rights." Madewell v.
Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990). Neither Robert Horn nor Marian Horn in their
affidavits makes any allegations of unlawful conduct against these individual Defendants. "Mere
allegations, unsupported by specific facts or evidence beyond the moving party's own conclusions,
are insufficient to withstand a motion for summary judgment." Ballard v. Heineman, 548 F.3d
1132, 1135 (8th Cir. 2008) (quoting Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2008)). As
such, Defendants Ostendorf, Lawrence, Neuman, and Austermann are entitled to summary
judgment.

Likewise, Plaintiffs base their claims against Cox on their unsupported beliefs, argument,
and speculation. See Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 801 (8th Cir. 2011)
(to survive summary judgment, nonmovant must substantiate allegations with sufficient probative
evidence permitting finding in his favor based on more than conjecture or speculation); see also
Beaulieu v. Ludeman, 690 F.3d 1017, 1024 (8th Cir. 2012) (conjecture and speculation are
insufficient to defeat summary judgment); Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th
Cir. 1994) (in seeking to defeat summary judgment, party must substantiate allegations with
sufficient probative evidence permitting finding in his favor based on more than conjecture and
speculation). The record before the Court shows Cox was not at 4866 Viento Drive on September
9, 2005 or July 15, 2006, and he did not make any decisions regarding the arrest of Plaintiffs or
direct the responding officers how to proceed. Inasmuch as Plaintiffs have not presented any
admissible evidence to create a genuine issue of fact regarding Cox's role in the two incidents,
Cox is entitled to summary judgment.

"Qualified immunity protects governmental officials from liability for civil damages if they have not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Akins v. Epperly, 588 F.3d 1178, 1183 (8th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This immunity permits "'officers to make reasonable errors,' Habiger v. City of Fargo, et al., 80 F.3d 289, 295 (8th Cir. 1996), and provides 'ample room for mistaken judgments.' Malley v. Briggs, 475 U.S. 335, 343, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)." Borgman v. Kedley, 646 F.3d 518, 522 (8th Cir. 2011). In addition, "[t]he defense protects public officials unless they are 'plainly incompetent' or 'knowingly violate the law.'" Id. (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)). To determine whether government officials are entitled to qualified immunity, courts consider two factors: "(1) whether the facts alleged, construed in the light most favorable to [the plaintiff], establish a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that her actions were unlawful." Keil v. Triveline, 661 F.3d 981, 985 (8th Cir. 2011). The courts have discretion to decide which of the two prongs should be addressed first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "Although qualified immunity is an affirmative defense, the burden is on the plaintiff to plead, *and*, if presented with a properly supported motion for summary judgment, to present evidence from which a reasonable jury could find that the defendant officer has violated the plaintiff's constitutional rights." Moore v. Indehar, 514 F.3d 756, 764 (8th Cir. 2008) (citations omitted).

To determine whether officers are entitled to qualified immunity, the Court must ask (1) "whether the facts alleged or shown, construed in the light most favorable to [the plaintiffs],

establish a violation of a constitutional ... right," and (2) "whether that constitutional right was clearly established as of [the time of the relevant conduct], such that a reasonable official would have known that [his] actions were unlawful." Scott v. Benson, 742 F.3d 335, 339 (8th Cir. 2014) (second alteration in original) (quoting Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009)). The officers are entitled to qualified immunity unless the answer to both of these questions is in the affirmative. See id.

### A. Fourth Amendment Unlawful Arrest

The record indicates that the state court determined Robert Horn was found guilty of interfering with an officer on September 9, 2005, and of peace disturbance, interference with an officer, and assault stemming from his arrest on July 15, 2006, and he is therefore collaterally estopped from attacking those determinations in a § 1983 action. Collateral estoppel, or issue preclusion, applies when a § 1983 plaintiff attempts to relitigate in federal court issues that were decided against him in a state criminal proceeding. Allen v. McCurry, 449 U.S. 90, 103 (1980); see Munz v. Parr, 972 F.2d 971, 973 (8th Cir. 1992) (stating that "collateral estoppel applies to section 1983 actions involving alleged Fourth Amendment violations); Simmons v. O'Brien, 77 F.3d 1093, 1097 (8th Cir. 1996) ("When a federal constitutional issue is previously decided in a state criminal proceeding following a full and fair hearing, issue preclusion will therefore bar relitigation of that issue in a § 1983 action.").

Robert's false arrest and unlawful search claims are barred inasmuch as the issues raised in his state criminal trial for interfering, assault and peace disturbance, are identical to the false arrest and search claims in the instant case. The jury verdicts of these criminal charges were decided on the merits. Robert was the named party to the state criminal action. He had a full and fair

opportunity to litigate fourth amendment issues regarding his arrests based on his motions to dismiss and suppress evidence, and the stated court denied the motions.  See, e.g., Ayers v. City of Richmond, 895 F.2d 1267, 1270-72 (9th Cir. 1990) (denial of motion to suppress collaterally estopped § 1983 claim for unlawful arrest)  His claims of false arrest and unlawful search are without merit because the issues of probable cause for his arrest have been judicially determined and the prior judgment was dependent on those issues.  Robert cannot relitigate the issue of his arrest in this instant action.  See, e.g., Grant v. Farnsworth, 869 F.2d 1149, 1151 (8th Cir. 1989) (§ 1983 action for false arrest held collaterally estopped by prior conviction for interference with official acts).

This Court must give a state court judgment the same preclusive effect it would be given under the law of the state where it was rendered. 28 U.S.C. § 1738; W.F.M., Inc. v. Cherry County, 279 F.3d 640, 643 (8th Cir. 2002).  The following elements are required for collateral estoppel to apply under Missouri law: (1) the issue in the present action is identical to the issue decided in the prior adjudication; (2) the prior adjudication resulted in a judgment on the merits; (3) the party against whom issue preclusion is asserted was a party or is in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit.  State ex rel. Haley v. Groose, 873 S.W.2d 221, 223 (Mo. 1994) (en banc).  The Court has reviewed the records of the underlying criminal case and having done so finds that all four elements are met here.  Plaintiff Robert's claims of unlawful arrest and illegal search and seizure are therefore barred by the principles of collateral estoppel.

### B.  Excessive Use of Force

Plaintiffs argue that Defendants violated their Fourth Amendment their Fourth Amendment right to be free from unreasonable seizures by using excessive force.  <u>Chambers v. Pennycook</u>,. 641 F.3d 898, 905 (8th Cir. 2011) (noting the Fourth Amendment framework is appropriately applied to excessive force claims arising out of incidents occurring both before and shortly after arrest).  The Supreme Court has explained that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).  An officer's use of force will violate the Fourth Amendment if it is not "objectively reasonable."  <u>Id.</u> at 397.  Because "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving" - the reasonableness of a particular use of force "mut be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  <u>Id.</u> at 396-97.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  <u>Id.</u> at 396 (quotation omitted).  The Court considers the specific circumstances, such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether is actively resisting arrest or attempting to evade arrest by flight."  <u>Id.</u>

Two of the three factors in <u>Graham</u> weigh against Robert and in favor of finding no excessive use of force: he was resisting, and he posed a threat to the officers.  Likewise, Robert submitted no evidence showing brutality or injuries stemming from his arrest on September 9, 2005.  In his deposition, he testified that he was pushed and threatened by the police officers, but he sustained no injury.  The record is devoid of any medical treatment records following the arrest.

There is no evidence in the record supporting his excessive use of force claim stemming from his September 9, 2005 arrest.

With respect to Marian's arrest on July 15, 2006, in her deposition she testified how Most was pretty gentle when he handcuffed her, and he very carefully helped her into the police cruiser. (Marian Horn Depo. at 56). The record shows the only physical injury she sustained was the markings on her wrists from the handcuffs that lasted a day and slight bruising. (Id. at 160). Although the Eighth Circuit Court of Appeals has found the presence of only de minimis injury does not foreclose an excessive use of force claim, in the handcuff context, the Chambers court reaffirmed the previous holdings that "[f]or the application of handcuffs to amount to excessive force, there must be something beyond minor injuries." Chambers, 641 F.3d at 907 (quoting Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005). Marian Horn has produced no evidence that she suffered anything beyond minor injuries due to the handcuffing and thus cannot demonstrate a Fourth Amendment violation.

Likewise, Marian's placement in a hot police car for approximately fifteen minutes causing her to experience a hot flash sensation does not establish a Fourth Amendment violation. She testified that after she was detained in a hot police car for approximately fifteen minutes, she experienced a hot flash sensation, but she felt better once she poured water over herself so she did not request an ambulance or seek any medical attention at the St. Louis County Jail. The record shows Marian did not seek any medical treatment immediately following her arrest on July 15, 2006. Although she testified she receives treatment all the time for heat stress, the record shows Dr. Mary Kreuter treated her once on June 29, 2009 for hot flashes and directed her call as needed. The record is devoid of any medical evidence showing causation between her treatment

for hot flashes and feeling hot while detained in the police car. Even if placing Marian in the car for fifteen minutes was unreasonable under the circumstances, Defendants are entitled to qualified immunity because she only suffered de minimis injury as a result. Until June 2011 with the Eighth Circuit's decision in Chambers, it was "an open question in [the Eighth Circuit] whether an excessive force claim require[d] some minimum level of injury." Chambers, 641 F.3d at 904. Because Marian's arrest occurred almost five years before the Eighth Circuit decided Chambers, Defendants could reasonably believed their actions were constitutionally permissible as long as they did not cause more than de minimis injury. Defendants would be entitled to qualified immunity if Marian's injuries were de minimis.

At the time of his arrest on July 15, 2006, it was clearly established that an arrestee enjoyed the right to be free from excessive force during an arrest. Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006). In 2011, the Eighth Circuit made it clear that an excessive force inquiry must focus on the force applied rather than the resulting injury. Chambers, 641 F.3d at 936. However, at the time of Robert's arrest, it was unclear whether an officer violated the rights of an arrestee by applying force that caused only de minimis injury. Id. at 908. Thus, a reasonable officer could have believed that as long as he did not cause Robert more than de minimis injury, his actions would not run afoul of the Fourth Amendment. See Id.; see also McClennon v. Kipke, 821 F.Supp.2d 1101 (D.Minn. 2011).

Defendants argue that they are entitled to summary judgment under the doctrine of qualified immunity with respect to Robert Horn's arrest on July 15, 2006 because either 1) they did not violate his Fourth Amendment rights when they applied their tasers and used the pepper spray or 2) the state of the law on the date they used the tasers and used the pepper spray on him would

not have informed them that their use of force was unconstitutional. Robert asserts that the officers are not entitled to qualified immunity because there are triable issues of fact whether the officers violated his Fourth Amendment right to be free from excessive force. The undersigned finds that the Defendants are entitled to qualified immunity such that summary judgment should be granted.

"Qualified immunity protects governmental officials from liability for civil damages if they have not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Akins v. Epperly, 588 F.3d 1178, 1183 (8th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This immunity permits "'officers to make reasonable errors,' Habiger v. City of Fargo et al., 80 F.3d 289, 295 (8th Cir. 1996), and provides 'ample room for mistaken judgments.' Malley v. Briggs, 475 U.S. 335, 343, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)." Borgman v. Kedley, 646 F.3d 518, 522 (8th Cir. 2011). In addition, "[t]he defense protects public officials unless they are 'plainly incompetent' or 'knowingly violate the law.'" Id. (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)). To determine whether government officials are entitled to qualified immunity, courts consider two factors: "(1) whether the facts alleged, construed in the light most favorable to [the plaintiff], establish a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that her actions were unlawful." Keil v. Triveline, 661 F.3d 981, 985 (8th Cir. 2011). The courts have discretion to decide which of the two prongs should be addressed first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "Although qualified immunity is an affirmative defense, the burden is on the plaintiff to plead, *and*, if presented with a properly supported motion for summary judgment, to present

evidence from which a reasonable jury could find that the defendant officer has violated the plaintiff's constitutional rights." Moore v. Indehar, 514 F.3d 756, 764 (8th Cir. 2008) (citations omitted).

The Court will first address whether using tasers on Robert several times violated his Fourth Amendment right to be free from excessive use of force. "'Where, as here, the excessive force claim arises in the context of an arrest . . . of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment. . . .'" Chambers, 641 F.3d at 905 (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)). Courts apply an objective "reasonableness" when evaluating excessive force claims. Id. "The determination whether the force used to effect a seizure was reasonable ultimately requires a case-specific balancing "of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Id. at 906 (quoting Graham, 490 U.S. at 396) (internal quotation omitted). In making this determination, the degree of injury is not dispositive; rather, the rule focuses "on whether *the force applied* is reasonable from the perspective of a reasonable officer on the scene at the time the force was used." Id. (citation omitted).

Courts look at several factors to determine whether the force used was objectively reasonable, including "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Howard v. Kansas City Police Dept., 570 F.3d 984, 989 (8th Cir. 2009) (quoting Graham, 490 U.S. at 396). In addition to the circumstances surrounding the use of force, courts may consider the result of the force. Id. (citation omitted). Although reasonableness is a fact question for the jury, Defendants summary judgment is warranted where

"the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) (citations omitted).

Here, Defendants Hoots, Foppe, and Most argue that the amount of force used was reasonable in light of the totality of the circumstances. The undersigned agrees. When investigating the call for peace disturbance and shots fired, Defendants entered the house but Robert failed to respond to orders to come out, and when he thereafter exited his room with his hand behind his back. Defendants could not see what was in his hand, and Defendants contend that Robert did not comply with the commands to show his hand. Due to Robert's refusal to cooperate, the scene deteriorated quickly, and the officers were concerned for their safety. When Robert moved towards Defendants without exposing his hand, he created a threat to the Defendants knowing the dispatch of shots being fired and the alert on the address. After Robert failed to comply with orders to show his hand, Hoots deployed his Taser striking him, but Robert continued to move towards the officers. Foppe then deployed his Taser hitting Robert in the stomach and causing him to fall. Robert continued to struggle and resist despite being hit by the Tasers. Horn kicked Hoots and Hoots and Foppe gave two stun-drives. Even after being handcuffed, Robert kicked at the officers, and Hoots used pepper spray to stop him from kicking. The undisputed facts demonstrate that Robert ignored verbal commands, moved towards Defendants without showing his hand, and continued to kick at Defendants even after he was handcuffed. Hoots use of the pepper spray was reasonable because Robert continued to resist and kick at Defendants. Hoots administered two one second bursts of pepper spray in his fact to stop him from kicking. Defendants then placed Robert in leg restraints.

Courts judge the reasonableness of force "'from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight,' and [ ] must make 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" McKenney v. Harrison, 635 F.3d 354, 360 (8th Cir. 2011) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)). Here, the Defendants maintain that Robert did not comply with their orders, and the situation was escalating. The scenario confronting the officers justified their actions. Defendants verbally warned Robert repeatedly, but he continued to actively disobey. Thus, the Court finds that the use of force was reasonable .

However, the inquiry does not end with finding that Defendants are entitled to qualified immunity based on the reasonableness of their application of the tasers and the pepper spray. The Court must also determine whether the state of the law on the date they used such force was unconstitutional. The Court finds that the law was not clearly established on the date in question, such that Defendants are entitled to qualified immunity. "When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident." Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012) (citation omitted). "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). While fundamentally materially similar facts provide strong support for the conclusion that the law is clearly established, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Peizer, 536 U.S. 730, 741 (2002).

The Eighth Circuit Court of Appeals has found that, as early as 2005, "the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected mideemeanant who was not fleeing or resisting1 arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call . . . ." Brown, 574 F.3d at 499; see also Shekleton, 677 F.3d at 367 (finding that the general constitutional principals against excessive force in using a taser against a nonfleeing, nonviolent suspect were clearly established even where the court had not specifically made such determination).

In the instant case, however, the record shows Robert was resisting arrest and that the taser and pepper spray were used to subdue him. In Clark v. Ware, 873 F. Supp.2d 1117, 1122-1123 (E.D. Mo. 2012), the court noted that, in cases where plaintiffs are tasered "while actively resisting arrest by physically struggling with, threatening, or disobeying officers," courts either find that no constitutional violation occurred or that the right not to be tasered while resisting arrest was not clearly established when the incident happened. The Clark court found that the defendant officers did not violate clearly established law as of November 2009 in administering a taser where the plaintiff continued to actively resist arrest. Id. at 1123; see also Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 728 (7th Cir. 2013) (holding that police officer did not violate clearly established law in 2007 by using the taser in drive stun mode several times until the plaintiff, who was actively resisting arrest, was subdued); Cockrell v. City of Cincinnati, 468 F. App'x 491, 498 (6th Cir. 2012) (finding that the law in July 2008 was unclear as to whether tasing a suspect fleeing from the scene of a nonviolent misdemeanor constituted excessive force); Mattos v. Agaramo, 661 F.3d 433, 448 (9th Cir. 2011) (holding, in consolidated cases, that taser deployments in 2004 and 2006

did not constitute a clearly established Fourth Amendment violation); Bryan v. MacPherson, 630 F.3d 805, 833 (9th Cir. 2010) (finding that the law regarding tasers was not sufficiently clearly established in 2005 to warrant the denial of qualified immunity). Indeed, as aptly stated by the Sixth Circuit Court of Appeals, "[c]ases from this circuit and others, before and after May 2007, adhere to this line: If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012).

The evidence demonstrates that Robert actively resisted arrest and continued to do so even after two rounds of tasing. At the time of the incident, in 2006, no clearly established law existed which would have informed Defendants that their use of the tasers was excessive and in violation of the Fourth Amendment. Therefore, the Court finds that Defendants Hoots, Foppe, and Most are entitled to qualified immunity, and summary judgment in their favor is warranted.

The record shows that the officers shocked him shocked him twice with a Taser, gave two stun-drives , and administered two one-second bursts of pepper spray to his face during his arrest. However, the record is devoid of evidence showing that Robert suffered any serious or residual physical injury.[10] While a Taser delivers a "painful and frightening blow" that can render "even the most pain tolerant individuals utterly limp," McKenney, 635 F.3d at 362, the Eighth Circuit has held that in the absence of any long-term effects, the use of a Taser does "not inflict any serious

---

[10]In the Amended Complaint, Robert alleges that he suffered physical injuries including a major head injury. However, Robert has submitted no evidence, such as medical records or even testimony of a medical diagnosis, to support his allegations. His bare assertions, without evidence to support them, are insufficient to constitute something more than de minimus injuries. See e.g., Foster v. Metro Airports Comm'n, 914 F.2d 1076 , 1082 (8th Cir. 1990) (concluding that a claim of nerve damage was not tantamount to excessive force in the absence of "medical records indicating ... any long-term injury as a result of the handcuffs.").

injury." Cook v. City of Bella Villa, 582 F.3d 840, 851 (8th Cir. 2009); LaCross v. City of Duluth, 713 F.3d 1155, 1158 (8th Cir. 2013) (application of the Taser did not cause more than de minimis injury to the arrestee); McClennon, 821 F.Supp.2d 1107 (absent evidence of long-term effects, the use of a Taser does not inflict any serious injury). Because Robert's arrest occurred almost five years before the Eighth Circuit decided Chambers, Defendants could have reasonably believed their actions were constitutionally permissible as long as they did not cause more than de minimis injury. Although Robert was twice sprayed directly in the face with pepper spray for a few seconds, and suffered some pain and discomfort, he did not seek medical care and his injuries resolved themselves without medical intervention. Robert has not presented evidence that the pepper spray caused more than temporary pain and discomfort

. See Wertish v. Krueger, 433 F.3d 1062, 1066-67 (8th Cir. 2006) (finding de minimis "bruised ribs, a sore shoulder, and multiple abrasions to [the plaintiff's] face and head" that took six weeks to heal); Andrews v. Fuoss, 417 F.3d 813, 815-18 (8th Cir. 2005) (finding de minimis a sheriff's blow that made plaintiff "see stars" and left her with a sore neck, arm, and shoulder as well as a headache and increased post-traumatic stress symptoms).

### C. Unlawful Seizure

Plaintiff Marian Horn alleges Defendants arrested her without probable cause. "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause; and, an officer is entitled to qualified immunity if there is at least "arguable probable cause.'" Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008)). "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably

trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004). Probable cause is evaluated from the perspective of a reasonable person in the place of the officer. Id. The focus must be on what the officer knew at the time of the arrest. See United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003). "Officers are not required to conduct a mini-trial before making an arrest, but probable cause does not exist when a minimal further investigation would have exonerated the suspect." Amrine, 522 F.3d at 832 (internal quotations omitted). "In the wrongful arrest context, officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable." Copeland v. Locke, 613 F.3d 875, 880 (8th Cir. 2010) (quoting Baribeau v. City of Minneapolis, 596 F.3d 465, 478 (8th Cir. 2010). Conversely, the officer is not entitled to qualified immunity if "the officer should have known that the arrest violated plaintiff's clearly established right." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005).

The record indicates here that Defendants had at least arguable probable cause to arrest Marian Horn for interference. Several of the officers directed Marian to get back, and Shelvy told her to leave the room or move away, or she would be arrested. After being ordered to leave the house by Shelvy, Marian refused. Shelvy then ordered her arrest stemming from her failure to comply with his order. Defendants were responding to a call about shots being fired and peace disturbance and trying to restrain Robert who was resisting and kicking at the officers. Based on the foregoing and the evolving and escalating situation involving her brother, the Court concludes Shelvy and Rodriguez had probable cause to arrest Marian. And if probable cause did not exist, at the very least, the information available to Shelvy and Rodriguez provided "arguable probable

cause" to arrest Marian. Accordingly, Defendants Shelvy and Rodriguez are entitled to qualified immunity on Marian's claim against them based on her arrest.

### D. Civil Conspiracy

In the Amended Complaint, Plaintiffs assert a cause of action for conspiracy to violate their constitutional rights under certain provisions of the Constitution.

To prevail, Plaintiffs were required to show fact that would satisfy the following elements in order to show a civil conspiracy claim under Missouri law: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) the plaintiff[s] [were] thereby injured." Phelps v. Bross, 73 S.W. 3d 651, 657 (Mo. Ct. App. 2002). In other words, Plaintiffs must show that "defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding." Smith v. Bacon, 699 F.2d 434, 436 (8th Cir. 1983). Plaintiffs have offered no such evidence but instead, they offer mere speculation which is clearly insufficient to support a conspiracy claim. "Speculation and conjecture are not enough to prove a conspiracy exists." Mettler v. Whitledge, 165 F.3d 1197, 1206 (8th Cir. 1999). Plaintiffs have failed to produce any evidence from which a reasonable trier of fact could conclude that Defendants conspired with one another to unlawfully arrest Plaintiffs. Plaintiffs point to no evidence of any meeting of the minds between any of the Defendants. Although Plaintiffs allude to a meeting of the minds in the amended complaint, they did not support the assertion with any specific evidence of collusion and thus cannot withstand the motion for summary judgment. Plaintiffs' conclusory allegations and speculation without factual grounds are insufficient to support a claim of conspiracy. Summary judgment is appropriate as to any conspiracy allegations. See Reed v. City of St. Charles, Mo., 561 F.3d 788, 790-91 (8th Cir.

2009) (non-moving party may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit finding in his favor on more than speculation or conjecture).

### E. **Slander**

In the Amended Complaint, Plaintiffs allege that when Robert was arrested on September 9, 2005, one of the Defendants marked him as a "hazard," a designation for someone dangerous or mentally ill. Next, Plaintiffs contend that on July 15, 2006, Captain Cox radioed a dispatch and noted how Robert is mentally ill and has a hazard designation.

Libel and slander are subspecies of defamation. Nazeri v. Missouri Valley Coll., 860 S.W.2d 303, 308 (Mo. 1993). In order to prevail on a defamation claim, a plaintiff must establish "'1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation.'" Farrow v. Saint Francis Med. Ctr., 407 S.W.3d 579, 598-99 (Mo. 2013) (quoting Overcast v. Billings Mut. Ins. Co., 11 S.W.3d 62, 70 (Mo. banc 2000); Cockram v. Genesco, Inc., 680 F.3d 1046, 1050 (8th Cir. 2012). See also Klein v. Victor, 903 F. Supp. 1327, 1330 (E.D. Mo. 1995) (citing Nazeri, 860 S.W.2d at 312). "To demonstrate actual damages [in Missouri], plaintiffs must show that defamatory statements causes a quantifiable professional or personal injury, such as interference with job performance, psychological or emotional distress, or depression." Cockram, 680 F.3d at 1054 (quoting Arthaud v. Mut. Of Omaha Ins. Co., 170 F.3d 860, 862 (8th Cir. 1999)). Whether language is defamatory and actionable is a question of law. Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 820 (8th Cir. 2010). "In Missouri, whether language is defamatory and actionable is a question of law to be determined by the court, and the court must determine

whether a statement claimed to be slanderous is reasonably capable of defamatory meaning." Id. (quoting Rockwood Bank v. Gaia, 170 F.3d 833, 841 (8th Cir. 1999). "A communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Henry v. Halliburton, 690 S.W.2d 775, 779 (Mo. 1985) (citing Restatement (Second) of Torts § 559).


After the September 9, 2005 incident, Haefeli placed a CAD alert on Robert's address but any statement was made only for law enforcement purposes and thus a privileged communication and was not published. There is no evidence showing that the CAD alert on Robert's address was published outside of the police dispatching system or used for purposes other than law enforcement. Likewise, the statements made by Cox regarding Robert's mental status were made only to the police dispatcher at the time of the July 15, 2006 incident. Cox's statement to the dispatcher about his mother hearing gunshots does not name Robert. These statements were never published to third parties, but the statements were made to other members of the St. Louis County Police Department and thus Plaintiffs have failed to establish a necessary element of their defamation claim, namely the publication requirement. See Gray v. AT& T Corp., 357 F.3d 763, 766 (8th Cir. 2004) (holding that communications made in the regular course of business within an organization are not publications to third persons). Defendants are entitled to judgment as a matter of law.

The record is further devoid showing damage to Robert's reputation. "Proof of actual harm is an absolute prerequisite in a defamation action." Cockram, 630 F.3d at 1053-54. "To demonstrate actual damages [in Missouri], plaintiffs must show that defamatory statements caused

a quantifiable professional or personal injury." Id. at 1054. The damages alleged by Robert are nothing more than conclusory statements without any factual support.

### F. Malicious Prosecution/Abuse of Process

"To succeed on a claim for malicious prosecution, the plaintiff has the burden of proving that the defendant instigated the prosecution of the underlying criminal case against him, without probable cause and with malice, which was terminated in his favor, and resulting in damages to him." Doyle v. Crane, 200 S.W.3d 581, 586 (Mo. Ct. App. 2006). Missouri law requires "that proof of the essential elements of malicious prosecution be strict and clear." Burnett v. Griffith, 769 S.W.2d 780, 783 (Mo. 1989). The elements of malicious prosecution are (1) the commencement of an earlier prosecution against the plaintiff; (2) the instigation of the prosecution by the defendant; (3) the termination of the proceedings in favor of the plaintiff[11]; (4) the absence of probable cause for the prosecution; (5) malice by the defendant in instituting the prosecution; and (6) damage to the plaintiff resulting from the prosecution. Copeland v. Wicks, No. ED 101012, 2015 WL 343644, at *6 (Mo. Ct. App. Jan. 27, 2015) (citing Crow v. Crawford & Co., 259 S.W.3d 104, 114 (Mo. Ct. App. 2008)). "Malice" means "that the suit was intentionally initiated or continued without the honest belief that it was lawful when done." King v. Young, 304 S.W.3d 224, 227 (Mo. Ct. App. 2009). "To demonstrate the legal malice necessary to sustain the judgment, [Marian Horn] [i]s required to show that either [Defendants] had an illegitimate motive for the prosecution, or that [they] knowingly acted with flagrant disregard for [her] rights so that

---

[11]As discussed above, the record indicates that the state court determined Robert was found guilty of interference, assault, and peace disturbance charges, and so he cannot meet this element. Diehl v. Fred Weber, Inc., 309 S.W.3d 309, 318 (Mo. Ct. App. 2010) ("The plaintiff must prove all six elements to make a submissible case of malicious prosecution.").

an improper motive may be inferred." Cassady v. Dillard Dept. Stores, 167 F.3d 1215, 1219 (8th

Cir. 1999). A defendant in a malicious-prosecution suit may establish a right to summary judgment

by showing facts that negate any element of the malicious prosecution claim. Copeland, 2015 WL

343644, at *6.

Here, even if the Court presumes that Marian could prove the other elements of a

malicious-prosecution claim, it is clear she fails to offer evidence from which a jury could conclude

that Defendants acted with the required "malice." For purposes of a malicious-prosecution claim,

"malice is defined as "any purpose other than that of bringing an offender to justice." Restatement

(Second) of Torts § 653. At most, the record supports a conclusion that Defendants omitted

certain key facts in the investigative report of the incident as cursory alleged in her affidavit. There

in no evidence on the record that Defendants' purpose was anything other than bringing an

offender to justice.

"[A]buse of process is different from malicious prosecution." Moffett v. Commerce Trust

Co., 283 S.W.2d 591, 599 (Mo. 1955). "The elements of an abuse of process claim are (1) the

present defendant made an improper, illegal, perverted use of process, which use was neither

warranted nor authorized by the process; (2) the defendant had an illegal purpose in doing so; and

(3) damage resulted." Crow v. Crawford & Co., 259 S.W.3d 104, 116 (Mo. Ct. App. 2008). The

defendant must have acted willfully and had some ulterior purpose in the improper use of process,

which can be inferred from the wrongful use of process. Id. Plaintiff Marian Horn has not

presented evidence that Defendants made an improper, illegal, or perverted use of process.

For these reasons, Defendants' motion for summary judgment with respect to malicious

prosecution or abuse of process will be granted. Torgerson v. City of Rochester, 643 F.3d 1031,

1042-43 (8th Cir. 2011) (explaining that "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial'") (quoting Ricci v. DeStefano, 557 U.S. 557, 586 (2009)).

### G.  Intentional Infliction of Emotional Distress[12]

Intentional infliction of emotional distress requires that the defendant to act intentionally or recklessly, the conduct must be extreme and outrageous, and the conduct must be the cause of extreme emotional distress that results in bodily harm.  Thomas v. Special Olympics Missouri, Inc., 31 S.W.3d 442, 446 (Mo. Ct. App. 2000).  The conduct must have been so outrageous and extreme as to go "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id.  Wrongful conduct alone cannot serve as a basis for the tort, and it is essential that the conduct be intended only to cause emotional distress to the victim.  Id.

In order to establish the tort of intentional infliction of emotional distress, a plaintiff must prove (1) the defendant's conduct was outrageous or extreme; (2) the defendant acted intentionally or recklessly; (3) plaintiff suffered extreme emotional distress that resulted in bodily harm; (4) that was caused by defendant's conduct; and (5) the conduct was intended solely to cause extreme emotional distress to the victim.  Crow v. Crawford & Co., 259 S.W.3d 104, 119 (Mo. Ct. App. 2008).  The defendant's sole intent must be to cause extreme emotional distress to the plaintiff.  Bailey v. Bayer Cropscience L.P., 563 F.3d 302, 310 (8th Cir. 2009) (citing Gibson v. Brewer, 952 S.W.2d 239, 249 (Mo. 1997)).  The alleged emotional distress must be "medically diagnosable and

---

[12]The undersigned notes in the Fourth Amended Complaint, Plaintiffs allege Defendant Officers verbally abused them as the outrageous conduct for the basis of the intentional infliction of emotional distress claims.

medically significant." <u>Hendrix v. Wainwright Indus.</u>, 755 S.W.2d 411, 412 (Mo. Ct. App. 1988).

Nothing in the record suggests that Defendants intended to cause Plaintiffs extreme emotional

distress.  Likewise, the record is devoid any evidence showing that Plaintiffs

suffered bodily harm.  <u>See</u> <u>Balke v. Ream</u>, 33 S.W.3d 589, 595 (Mo. Ct. App. 2000) (plaintiff

must show that defendant's conduct caused plaintiff severe emotional distress resulting in bodily

harm).  Plaintiffs have identified Dr. Larry Kiel, a licensed psychologist, who evaluated Plaintiffs in

2009 on referral by their attorney.  (Pltfs' Exhs. 5 and 6).  Listed as the stated purpose of Marian's

evaluation on July 29 and August 3, 2009, Dr. Kiel noted "[i]nitial investigation into possible

trauma experienced as a result of situation which may become a forensic matter" with "[t]wo

clinical interviews: three self-administered psychological inventories."  (Exh. 6).  Listed as the

stated purpose of Robert's evaluation on November 4, 6, and 9, 2009, Dr. Kiel noted: "[i]nitial

evaluation to determine possible trauma arising from two incidents involving police entry at home"

with [t]hree clinical interviews; four self-administered psychological inventories."  (Exh. 5).

Marian did not seek any medical treatment immediately following her arrest on July 15, 2006, and

she did not see Dr. Kreuter for heat stress prior to July 28, 2009.  Although Marian testified she

receives treatment all the time for heat stress, the only medical record shows on June 29, 2009, Dr.

Mary Kreuter treated her for hot flashes and directed Marian to call as needed for treatment.

Here, Plaintiffs have failed to provide medical documentation establishing that they suffered

extreme emotional distress due to Defendants' conduct, and no evidence they suffered severe

emotional distress that resulted in bodily harm.  The Court finds Plaintiffs have failed to present

expert medical testimony to support their claims for emotional distress.  Because Plaintiffs have

not presented expert medical testimony of medically diagnosable and medically significant emotional distress, there is not genuine issue of material fact.

In summary, Defendants have established that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. For the above reasons, the Court finds Defendants are entitled to summary judgment. Accordingly,

**IT IS FURTHER ORDERED** that Defendants Eric Austermann, Joseph Brandt, Kenneth Cox, Colin Foppe, Haefeli, Timothy Harrison, Jeffery Hoots, Joshua Lawrence, Christopher Most, Jason Nueman, William Ostendorf, Charlie Rodriguez, and Robert Shelvy's Motion for Summary Judgment (Docket No. 167) is GRANTED.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss for Failure to State a Claim  (Docket No. 132) is DENIED AS MOOT.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


Dated this  _15th_  day of April, 2015.

                                        _____/s/Terry I. Adelman_____
                                        UNITED STATES MAGISTRATE  JUDGE